IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 29 MAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court at No. 856 EDA 2017 dated |
| | : | September 10, 2018 Affirming the |
| v. | : | Judgement of Sentence dated |
| | : | January 31, 2017 by the |
| | : | Montgomery County Court of |
| NAZEER TAYLOR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-3166-2014. |
| Appellant | : | |
| | : | ARGUED: November 19, 2019 |

## OPINION

**JUSTICE WECHT**                                                    **DECIDED: May 19, 2020**

This appeal asks whether a minor's Fifth Amendment privilege against compulsory self-incrimination was violated when a juvenile court granted the Commonwealth's request to have a delinquency matter transferred to an adult court for criminal prosecution, based in part upon the minor's decision not to admit culpability to the delinquent acts alleged. We hold that it was.

**I.**

The events that formed the basis of Nazeer Taylor's prosecution occurred between July 2012 and August 2013, when he was fifteen years old. In March 2014, the Commonwealth filed a delinquency petition alleging that Taylor committed numerous delinquent acts purportedly stemming from recurring incidents of sexual assault of his

then-eleven-year-old foster brother, A.O. Pursuant to Section 6355 of the Juvenile Act, 42 Pa.C.S. § 6355, the Commonwealth petitioned the Court of Common Pleas of Montgomery County, Juvenile Court Division, to transfer the delinquency petition to the adult division for criminal prosecution.

A two-day certification hearing commenced on April 2, 2014, before the Honorable Joseph A. Smyth. At the hearing, A.O. testified that Taylor orally and anally sodomized him on several occasions when A.O. was in sixth grade, resulting in chronic physical damage and severe mental anguish. Notes of Testimony ("N.T."), 4/2/2014, at 6-77. The boys' foster mother also described a number of discrete episodes that piqued her suspicions that Taylor might have engaged in improper behavior with A.O. *Id.* at 77-112. In light of this testimony, the juvenile court found that the Commonwealth had established a *prima facie* case that Taylor had committed the delinquent acts alleged in the petition. *Id.* at 114-15. Due to Taylor's prior delinquency adjudication for burglary, a first-degree felony, the burden shifted to the defense to establish that transfer would not serve the public interest. *See* 42 Pa.C.S. § 6355(g).[1]

---

[1] In a typical case, the Juvenile Act places upon the Commonwealth "[t]he burden of establishing by a preponderance of evidence that the public interest is served by the transfer of the case to criminal court and that a child is not amenable to treatment, supervision or rehabilitation as a juvenile." 42 Pa.C.S. § 6355(g). The Commonwealth is relieved of that burden, however, under the following conditions:

(1)(i) a deadly weapon as defined in 18 Pa.C.S. § 2301 (relating to definitions) was used and the child was 14 years of age at the time of the offense; or

(ii) the child was 15 years of age or older at the time of the offense and was previously adjudicated delinquent of a crime

The hearing was continued to April 25, 2014, for Taylor's rebuttal. To substantiate Taylor's claim that he was amenable to treatment in the juvenile system, the defense offered the expert testimony of Dr. Nicole Machinski, a licensed clinical psychologist who specializes in forensic assessment, including the identification and treatment of juvenile sex offenders. N.T. 4/25/2014, at 4, 9. Based upon her evaluation of Taylor and her review of the underlying record, Dr. Machinski opined that Taylor "could certainly be treated" in the three years he had remaining "under the purview of the juvenile justice system" through either an outpatient or residential treatment program, which average "about 12 months" in length. *Id.* at 21-22. Upon cross-examination, the Commonwealth challenged Taylor's amenability to treatment by, *inter alia*, invoking the fact that Taylor had neither admitted to the delinquent act nor affirmatively taken responsibility for his actions. Specifically, the Commonwealth suggested that Taylor was "in denial" of his need for treatment, prompting a defense objection, which the court sustained. *Id.* at 44.

---

that would be considered a felony if committed by an adult; and

(2) there is a prima facie case that the child committed a delinquent act which, if committed by an adult, would be classified as rape, involuntary deviate sexual intercourse, aggravated assault as defined in 18 Pa.C.S. § 2702(a)(1) or (2) (relating to aggravated assault), robbery as defined in 18 Pa.C.S. § 3701(a)(1)(i), (ii) or (iii) (relating to robbery), robbery of motor vehicle, aggravated indecent assault, kidnapping, voluntary manslaughter, an attempt, conspiracy or solicitation to commit any of these crimes or an attempt to commit murder as specified in paragraph (2)(ii) of the definition of "delinquent act" in section 6302.

*Id.* § 6355(g)(1)-(2). When the foregoing "criteria are met, the burden of establishing by a preponderance of the evidence that retaining the case under this chapter serves the public interest and that the child is amenable to treatment, supervision or rehabilitation shall rest with the child." *Id.* The parties do not dispute that the transfer statute's burden-shifting criteria were satisfied here.

The Commonwealth subsequently posited that "the first step in sex offender treatment [is] admitting guilt," *id.* at 58, and, after the close of evidence, reiterated its view that Taylor was "in denial" and that an "admission" would be necessary for treatment to work in this case. *Id.* at 109.

The juvenile court agreed with the Commonwealth that Taylor was not amenable to treatment within the juvenile system, certified the matter to adult criminal court, and contemporaneously offered the following rationale in support of its ruling:

> I think one of the Commonwealth's arguments is that the defendant has been in treatment for almost every issue that the defendant's expert has identified and, notwithstanding that treatment, within six months committed a series of forcible rapes, which is much more serious than the issue he was in treatment for.
>
> I think the defense expert makes a distinction, and so does the defendant -- or they make a good point, not necessarily a distinction -- when they say, look, the sex offense is totally different than the burglary. And because someone was successful in a burglary, that's not at all related to the sexual offense, and he never really got treatment for the sexual offense. That's basically the argument as I understand it.
>
> And I don't necessarily disagree with that, but then I think the defense expert becomes a little bit inconsistent and sort of goes back and forth where she counters that particular Commonwealth with [*sic*] you can't compare these other matters to a sex offense, but then she goes back and forth and says but because he did well in treatment in the other matters, he will do well for treatment as a sex offender. So in one sense, she tries to separate the two, and then in another sense, she tries to blend the two, and I find that testimony to be inconsistent.
>
> I think another dilemma or conundrum for the defense is that's their approach, he's had an unfortunate upbringing, through no fault of his own. To a [] certain extent, he is antisocial and damaged, and that's not his fault. But is he so damaged that he can't be rehabilitated for a sex offender, or can he be rehabilitated for a sex offender? And I think part of the dilemma is they don't distinguish sex offenders from burglary, so now they blend their argument and say because he's done well in the first, he can do well in the second.

And **they won't admit that he's committed the sex offense, and that's sort of their conundrum, because time is of the essence**. He's approaching 18 years old. The act -- you can argue degree of sophistication all you want, but it was a predatory damaging act that occurred repeatedly over a 1-year period of time.

**If you're going to go on the sex offenders' treatment, it's important that you admit, No. 1**; examine your triggers, No. 2; talk about how you can avoid your triggers; and identify up-front the depth of the problem. **And here, we can't identify the depth of the problem largely because we're not admitting yet that there is a problem.**

**What if he were to sit there for a year and a half before he finally admitted that he did something? I mean, I assume he's still denying.** Counsel's arguments have been phrased "if this is true, it's a horrendous act."

**They made a distinction when he denied, when he said to Dr. Buxbaum** -- I believe he was a psychiatrist -- **"I didn't do anything wrong."** Counsel said now he wants to say he participates in treatment and defense counsel argued, well, maybe the treatment's not talking about sex offenders' treatment. And that's the very issue, though, is he amenable to sex offenders' treatment? And, in the juvenile system, time is running out. As I said, there is only a few years left, and the depth -- and if he doesn't make sufficient progress, he's 21, he's back on the streets, and he's released from the jurisdiction of the Court with no supervision at all. That's the dilemma.

And when Dr. Machinski in her report indicates the issues that he needs treatment in and the Commonwealth argues, well, none of this has to do with amenability within the statute, well, it might, when you have four other categories. It would certainly refer to amenability for a crime that's much less serious than this. But I don't know that it means anything with regard to somebody who's committed the type of act that he's alleged to have committed.

So for all the reasons in the statute as enumerated by [the Commonwealth] and because it's the defense burden of proof, I'm going to grant the Commonwealth's motion to certify him to adult court. Thank you.

*Id.* at 112-15 (emphasis added).

Following certification, from June 20-21, 2016, Taylor was tried before a jury, with the Honorable William R. Carpenter presiding. At the conclusion of trial, the jury found Taylor guilty of rape of a child and some related crimes. On January 31, 2017, the court

sentenced Taylor to an aggregate term of ten to twenty-five years' imprisonment, followed by ten years' probation. Taylor appealed his judgment of sentence.

In an unpublished decision, the Superior Court affirmed. *Commonwealth v. Taylor*, 856 EDA 2017, 2018 WL 4290127 (Pa. Super. Sept. 10, 2018). Relevant here, Taylor asserted that the juvenile court violated his Fifth Amendment privilege against compulsory self-incrimination when deciding whether to transfer the matter by relying substantially upon Taylor's refusal to admit to the alleged offenses. The panel noted that "[a]lthough Taylor did not raise this claim in his [Pa.R.A.P.] 1925(b) statement, he did not waive it. Whether certification is proper is a question of jurisdiction, which cannot be waived." *Id.* at *5 (citing *Commonwealth v. Johnson*, 669 A.2d 315, 320 (Pa. 1995) ("[T]he decision to transfer a case between the juvenile and criminal divisions in jurisdictional.")). Turning to the merits, the court acknowledged that it previously had held that the privilege against self-incrimination applied in decertification proceedings, which require the same amenability-to-treatment analysis for juvenile defendants.[2] In *Commonwealth v. Brown*, 26 A.3d 485 (Pa. Super. 2011), a homicide case involving an eleven-year-old appellant, the panel reversed an order denying decertification because the trial court relied upon the Commonwealth's expert witness, who had testified that Brown needed to admit guilt in order to prove his amenability to treatment in the juvenile system. The Superior Court

---

[2]     Because the Juvenile Act excludes certain crimes, such as murder, from the definition of "delinquent act," 42 Pa.C.S. § 6302, jurisdiction over such cases is vested in adult criminal court in the first instance. A juvenile so charged may petition the trial court to decertify the case and have the matter transferred to the juvenile court for adjudication. The standards for certification apply with equal force in the decertification context. *See id.* § 6322(a).

reasoned that, by holding Brown's failure to incriminate himself against him, the court violated his Fifth Amendment privilege. *Id.* at 510.

Here, the juvenile court similarly "referenced Taylor's failure to admit guilt and that admission was a step in sex offender treatment." *Taylor*, 2018 WL 4290127 at *6. Citing *Brown*, the Superior Court succinctly concluded that "[t]his was error." *Id.* Notwithstanding that "impermissible consideration," however, the panel determined that the juvenile court did not abuse its discretion in finding that Taylor had failed to carry his burden to establish that his case should remain in the juvenile system. The panel reasoned that the juvenile court's ruling was based upon the totality of the evidence presented at the hearing, which included "the seriousness of the alleged crime, the time remaining in the court's jurisdiction, and the failure of Taylor's previous treatment to prevent the alleged crimes." *Id.* Accordingly, despite the juvenile court's erroneous invocation of Taylor's silence, the Superior Court affirmed the order certifying his transfer to adult court.

We granted Taylor's petition for allowance of appeal in order to consider whether the juvenile court violated the Fifth Amendment by considering Taylor's silence in deciding whether to certify the case for transfer to adult court for prosecution, an issue of first impression in this Court, and one of great importance to the Commonwealth.[3]

---

[3] Specifically, we granted review of the following questions, rephrased for clarity:

a. Does a juvenile court violate the Fifth Amendment by holding a juvenile's failure to admit guilt against him during a certification hearing?

b. Did the Superior Court erroneously conclude that a juvenile court does not abuse its discretion by holding a juvenile's failure to admit

**II.**

**A.**

Taylor acknowledges that the Commonwealth satisfied the initial prerequisites for certification—namely, that it established a *prima facie* case that, when Taylor was at least fifteen years of age, he "committed a delinquent act which, if committed by an adult, would be classified as" one of the enumerated felonies under Section 6355(g)(1)-(2)—thus shifting the burden to Taylor to demonstrate his amenability to treatment within the juvenile system. He insists, however, that the defense carried its burden on rebuttal through the expert testimony of Dr. Machinski. He also notes that even the Commonwealth's expert, Michael Yoder, a supervisor with Montgomery County Juvenile Probation, conceded on cross-examination that treatment within the juvenile system could work for Taylor and "made it clear that his opinion [on Taylor's amenability to treatment] was squarely and solely based on the fact that Taylor had not admitted to the crime charged." Brief for Taylor at 21 (citing N.T., 4/25/2014, at 99).

Focusing upon Yoder's testimony that there was insufficient time left within the jurisdiction of the juvenile court, Taylor maintains that the expert's opinion was premised upon the ostensible significance of his refusal to admit to the crimes alleged. *Id.* The Commonwealth's argument to the juvenile court similarly stressed his lack of a confession—a factor upon which Taylor claims the court placed great weight. *Id.* at 22 (observing that four of the ten paragraphs of the court's analysis were "devoted to the fact

guilt against him during a certification hearing because the court also considered other statutorily-required factors when making its certification decision?

*Commonwealth v. Taylor*, 204 A.3d 361 (Pa. 2019) (*per curiam*).

that Taylor had never admitted to committing the crimes he pled not guilty to, and also that Taylor's attorney had not admitted in open court that Taylor committed the alleged crimes"). In fact, Taylor argues, "while the juvenile court's remarks can be difficult to parse, the juvenile court actually gives no reason for its decision other than Taylor's refusal to incriminate himself." *Id.* Therefore, Taylor posits that the lower court not only misapplied the certification statute, but also violated his Fifth Amendment privilege against self-incrimination.

Furthermore, Taylor disputes the notion that we must ask "whether" the Fifth Amendment applies to juvenile transfer hearings, noting that its applicability was established by the Supreme Court of the United States more than half-a-century ago in *Kent v. United States*, 383 U.S. 541 (1966) (holding that juvenile transfer proceedings are subject to the guarantees of due process), and in *In re Gault*, 387 U.S. 1, 47-48 (1967) (holding that the Fifth Amendment applies to juveniles and may be "claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory") (quoting *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 94 (1964)). *See* Brief for Taylor at 24 (citing *Gault*, 387 U.S. at 47 ("It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children. The language of the Fifth Amendment . . . is unequivocal and without exception. And the scope of the privilege is comprehensive.")). From this authority, Taylor deduces that "it is clear that the Fifth Amendment 'applies' to a certification hearing." *Id.* at 24 (citing *Commonwealth v. Batty,* 393 A.2d 435, 439 n.3 (Pa. 1978)).

Taylor asserts that he was penalized for failing to incriminate himself in breach of the Fifth Amendment. He suggests that there is "no precedent from a single state across

our nation which has countenanced such a penalty for invoking one's Fifth Amendment right." *Id.* at 25 (citing *Christopher P. v. State*, 816 P.2d 485, 488 (N.M. 1991) ("[W]e find no precedents [in any jurisdiction] sanctioning a court order compelling a child to make inculpatory statements in the presence of the prosecution for any purpose.")). He underscores that the juvenile certification process holds "grave consequences" for a minor and notes that, had he remained in the juvenile system, any supervision of him would have ceased upon his twenty-first birthday. *Id.* His current sentence in the adult system, by contrast, carries a minimum of thirty-five years' supervision, including as much as twenty-five years' confinement in a state prison. *Id.* It is precisely these considerations, he surmises, that led the Supreme Court to declare that a transfer proceeding is a "'critically important' action determining vitally important statutory rights of the juvenile." *Id.* at 26 (quoting *Kent*, 383 U.S. at 556). Certification thus "has been accurately characterized as 'the worst punishment the juvenile system is empowered to inflict.'" *Id.* (quoting *Ramona R. v. Superior Court*, 693 P.2d 789, 795 (Cal. 1985) (internal citation omitted)). Because a defendant may not be penalized for the exercise of his right to remain silent, *id.* (citing *Wainwright v. Greenfield*, 474 U.S. 284 (1986)), Taylor contends that the Fifth Amendment concerns at play in the juvenile court's reasoning here readily are apparent.

Moreover, Taylor invokes the Supreme Court's "penalty cases," which he maintains "stand for the proposition that a person may not be penalized in any substantive way for the exercise of his Fifth Amendment rights." *See id.* at 27 (citing *Gardner v. Broderick*, 392 U.S. 273 (1968) (invalidating a police officer's termination for invoking Fifth Amendment privilege in appearance before a grand jury); *Lefkowitz v. Turley*, 414 U.S.

70 (1973) (affirming order striking down five-year ban on obtaining government contracts for New York-licensed architects who refused to sign immunity waivers upon being summoned to testify before a grand jury); *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) (striking down New York election law providing for five-year ban on holding public office for political party officers who refuse to testify before a grand jury or waive immunity against subsequent prosecution)). Notably, Taylor argues, the "penalties" at issue in the above-mentioned cases—loss of employment, government contracts, and the right to hold public office—are "plainly less severe than the penalty of an increase of the maximum period of incarceration by 22 years and an increase of the maximum period of total supervision by 32 years," as occurred here. *Id.* at 27-28.

Additionally, Taylor focuses upon the Superior Court's discussion in *Brown* concerning the availability of "use and derivative use" immunity under the Juvenile Act. Although the Superior Court did not address that aspect of the *Brown* decision, Taylor proffers that no statutory grant of immunity could have remedied the Fifth Amendment problem here. *Id.* at 28. In order for a grant of immunity to overcome the constitutional privilege against self-incrimination, Taylor contends, it must preclude not only the use of the incriminating statement itself, but also any fruits derived from that statement. *Id.* at 28-29 (citing *Kastigar v. United States*, 406 U.S. 441 (1972); *Commonwealth v. Swinehart*, 664 A.2d 957, 960 n.5 (Pa. 1995)). Taylor endorses *Brown*'s rationale and opines that the protections contained within 42 Pa.C.S. § 6338 are insufficient to displace the privilege because the statute provides mere "use" immunity, and would not extend to evidence derived from any incriminating statement supplied in the course of a court-

ordered psychiatric examination.[4]  Brief for Taylor at 29 (citing *Brown*, 26 A.3d at 499-502 (containing extensive discussion of immunity in the context of juvenile certification proceedings)).

*Brown*'s reasoning aside, Taylor cautions that Section 6338 also is inapplicable here because it refers to statements made by a minor "in the course of a screening or assessment," 42 Pa.C.S. § 6338(c)(1), not an incriminating admission in open court.  Brief for Taylor at 29.  Because any inculpatory statement offered to the juvenile court by Taylor or his attorney would not have been afforded both use and derivative use immunity, Taylor

---

[4]     Section 6338 of the Juvenile Act, entitled "Other basic rights," provides in relevant part:

> **(b) Self-incrimination.--**A child charged with a delinquent act need not be a witness against or otherwise incriminate himself. . . . A confession validly made by a child out of court at a time when the child is under 18 years of age shall be insufficient to support an adjudication of delinquency unless it is corroborated by other evidence.
>
> **(c) Statements and information obtained during screening or assessment.--**
>
>> (1) No statements, admissions or confessions made by or incriminating information obtained from a child in the course of a screening or assessment that is undertaken in conjunction with any proceedings under this chapter, including, but not limited to, that which is court ordered, shall be admitted into evidence against the child on the issue of whether the child committed a delinquent act under this chapter or on the issue of guilt in any criminal proceeding.
>>
>> (2) The provisions of paragraph (1) are in addition to and do not override any existing statutory and constitutional prohibition on the admission into evidence in delinquency and criminal proceedings of information obtained during screening, assessment or treatment.

42 Pa.C.S. § 6338(b)-(c).

asserts that the court's reliance upon his silence as grounds for certifying the matter constituted a penalty for exercising a constitutional right, in clear violation of the Fifth Amendment. *Id.* at 30.

Taylor further advances a quasi-statutory argument with a constitutional flavor. He posits that requiring a self-incriminating statement as a prerequisite to a finding of amenability to treatment in the juvenile system is a fundamental misinterpretation of the Juvenile Act, because a statute may not be interpreted in a manner violative of the Constitution. *Id.* He highlights the *Gault* Court's rejection of the government's argument that obtaining confessions from juveniles would further the objectives of the juvenile statute at issue there. The Supreme Court disagreed, countering that "evidence is accumulating that confessions by juveniles do not aid in 'individualized treatment,' . . . and that compelling the child to answer questions, without warning or advice as to his right to remain silent, does not serve this or any other good purpose." *Gault*, 387 U.S. at 51. By obligating a juvenile to repent or to admit guilt on pain of transfer to adult court for criminal prosecution violates the Fifth Amendment, Taylor believes that the juvenile court not only infringed upon a fundamental privilege guaranteed by the Constitution, but also misapplied the Juvenile Act and exceeded its lawful authority. Brief for Taylor at 31-32.

In a similar vein, Taylor also cites this Court's rejection of an analogous argument in *Commonwealth v. Bethea*, 379 A.2d 102 (Pa. 1977), in which we held that a trial court could not impose a harsher sentence simply because a defendant exercised his Sixth Amendment right to a trial by jury. Significantly, the *Bethea* Court emphasized that requiring or encouraging an admission of guilt prior to adjudication is unconstitutional:

> Repentance has a role in penology. But the premise of our criminal jurisprudence has always been that the time for repentance comes after

trial. The adversary process is a fact-finding engine, not a drama of contrition in which a prejudged defendant is expected to knit up his lacerated bonds to society. . . .

Moreover, the refusal of a defendant to plead guilty is not necessarily indicative of a lack of repentance. A man may regret his crime but wish desperately to avoid the stigma of a criminal conviction.

In fact, a colorable argument can be made that a glib willingness to admit guilt in order to "secure something in return" may indicate quite the opposite of repentance, and that a reluctance to admit guilt may in fact reflect repentance.

*Id.* at 105 n.8 (quoting *Scott v. United States*, 419 F.2d 264, 270-71 (D.C. Cir. 1969) (internal citation omitted)). That same rationale applies here, Taylor says.

Turning to the second issue, Taylor avers that the Superior Court, having determined that the juvenile court misapplied Section 6355, compounded that error by concluding that the lower court did not abuse its discretion. He cites this Court's decision in *Commonwealth v. In re E.F.*, 995 A.2d 326 (Pa. 2010), for the proposition that, to constitute an abuse of discretion, "the court rendering the adult certification decision must have misapplied the law, exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice." *Id.* at 329 (quoting *Commonwealth v. Jackson*, 722 A.2d 1030, 1032 (Pa. 1999)). Here, by misapplying the Juvenile Act in a manner that violated the Fifth Amendment, Taylor declares simply that "the juvenile court *per se* abused its discretion." Brief for Taylor at 34.

Taylor also claims that the Superior Court conflated the abuse-of-discretion standard with harmless-error review. *Id.* Assuming that harmless error is the applicable standard under these circumstances, Taylor contends that "it is plain that the juvenile court's error was not harmless." *Id.* Specifically, Taylor disputes the panel's conclusion that the juvenile court's contemplation of "proper statutory factors" somehow "sanitize[d]

the massive 'impermissible consideration,' as the Superior Court put it." *Id.* at 36 (quoting *Taylor*, 2018 WL 4290127 at *6). He analogizes the juvenile court's "reli[ance] upon an erroneous and unconstitutional factor" to the situation in *Bethea*, where this Court rejected the Commonwealth's contention that the sentencing court did not abuse its discretion by erroneously considering Bethea's jury demand when affixing his sentence because it also had considered other relevant, constitutional factors. *Id.* at 37-38.

Once an abuse of discretion has been established, Taylor advises, "a remand is generally the appropriate remedy." *Id.* at 38 (citing *E.F.*, 995 A.2d at 332-33). He asserts, however, that, having turned twenty-one during the pendency of this appeal, he now is beyond the jurisdiction of the juvenile court to re-adjudicate the Commonwealth's petition to transfer the case to criminal court. *Id.* (citing *In re Jones*, 246 A.2d 356, 363 n.5 (Pa. 1968) ("The Juvenile Court . . . loses jurisdiction over persons when they attain majority.")); *see also id.* at 39 (citing *Johnson*, 669 A.2d at 321 ("[W]e find that the transfer order in question is jurisdictional in every sense of the term. Hence, if the challenged order is improper, jurisdiction does not vest with the receiving court.")). Taylor distinguishes his situation from that at issue in *Kent*. *Id.* at 40-41. There, the Supreme Court recognized that, although it could not send the matter back to the juvenile court after Kent had aged out of the juvenile system, the Court could remand to the District Court for a *de novo* hearing pursuant to a "safety valve" in the D.C. Code, which permitted the District Court to exercise the powers of the juvenile court when the latter no longer had jurisdiction. *Kent*, 383 U.S. at 564 (citing *Black v. United States*, 355 F.2d 104, 107 (D.C. 1965)). Taylor contends that there is no such mechanism for holding an individual after he exceeds the age of maturity under Pennsylvania law if jurisdiction illegally was

vested with the criminal court. Brief for Taylor at 42. Because the "issue of [juvenile] certification is jurisdictional and therefore not waivable," *Commonwealth v. Moyer*, 444 A.2d 101, 102 (Pa. 1982), Taylor ventures that discharge is the only appropriate remedy for the infringement of his constitutional privilege.

**B.**

In a sparse, two-page response, the Commonwealth insists that there was no Fifth Amendment violation here because Taylor "opened the door to the court's limited consideration of his silence in relation to his amenability [t]o treatment before his 21st birthday." Brief for the Commonwealth at 11. Since Taylor's psychiatric expert opined that the then-seventeen-year-old Taylor adequately could be treated within the juvenile system before the court lost jurisdiction over him, the Commonwealth submits that the juvenile court was right to ponder whether Taylor "would admit guilt during treatment . . . or whether it might take months or years before he was willing to take the first necessary step in treatment." *Id.* at 12. "This was an appropriate consideration given defendant's evidence and argument." *Id.* (citing *United States v. Robinson*, 485 U.S. 25, 33-34 (1988) (holding that the defense may open the door to evidence of silence)).

The remainder of the Commonwealth's argument principally focuses upon establishing that any constitutional error was harmless. *See id.* at 13 ("Any error stemming from the consideration of defendant's refusal to incriminate himself was *de minimis* in view of the overwhelming evidence supporting the juvenile court's decision."). To that end, the Commonwealth builds upon the Superior Court's analysis of the noncontroversial factors supporting certification that the juvenile court considered. According to the Commonwealth, there was ample evidence of record demonstrating that

Taylor was not amenable to treatment, contrary to his expert's opinion that he could be treated within the time remaining in the juvenile system. *Id.* at 17-19.

Moreover, juvenile courts statutorily are required to consider a defendant's capacity for rehabilitation prior to the expiration of jurisdiction. *Id.* at 19 (citing 42 Pa.C.S. § 6355(a)(4)(iii)(G)). Consequently, the Commonwealth attests, the juvenile court was well within its authority to scrutinize whether three years was sufficient to effectively treat Taylor. Although the court stated that it would have been easier to measure the extent of Taylor's problem if he had confessed, the court "did not effectively require [Taylor] to admit guilt to prove his amenability because his lack of amenability was abundantly clear based on other factors," *id.* at 20, which the Commonwealth proceeds to outline in extensive detail. *See id.* at 20-27. Viewing the record as a whole, the Commonwealth gauges that "the juvenile court's consideration of [Taylor's] silence was a miniscule aspect of the evidence weighing against him, and thus it was harmless beyond a reasonable doubt." *Id.* at 27.

## C.

In reply, Taylor contests the Commonwealth's suggestion that he "opened the door" on the issue of his silence when Dr. Machinski agreed that successful completion of sex offender treatment often began with admitting guilt. Reply Brief for Taylor at 2. He notes the Commonwealth's omission of the fact that the expert merely was responding to the prosecutor's leading question over a defense objection, one that the juvenile court sustained. Taylor claims that the record demonstrates that "at no point did the defense ever reference Taylor's silence or in any other way raise the issue." *Id.* at 3. Furthermore, he explains, the Commonwealth's reliance upon *Robinson*—the sole precedent cited in

its argument on the principal issue presented—is misplaced. Although it is true that the *Robinson* Court held that a defendant may open the door to commentary on his silence, in that case the Supreme Court considered the prosecutor's remark that Robinson "could have taken the stand" to be a "fair response" to defense counsel's closing, in which he implied that the government had not allowed the defendant to explain his side of the story. *Id.* at 3 (quoting *Robinson*, 485 U.S. at 26, 32). Here, by contrast, the defense said nothing about Taylor's right or ability to testify. Taylor asserts that, at base, the Commonwealth implies that the defense inherently put Taylor's silence "at issue" simply by contesting certification, thus waiving his Fifth Amendment privilege *sub silentio*. That supposition, Taylor retorts, is premised upon a fundamental misinterpretation of the Juvenile Act.

Lastly, Taylor highlights the Commonwealth's failure directly to answer the second question presented, suggesting that the omission is a tacit concession that the juvenile court abused its discretion. Reiterating his view that a court *per se* abuses its discretion in committing a constitutional error, Taylor argues that the Superior Court's quasi-harmless error review was erroneous because a misapplication of the law resulting in the denial of a constitutional right can never be a *de minimis* infraction. He cites *Commonwealth v. Lewis*, 598 A.2d 975 (Pa. 1991), in which this Court held that, when a defendant requests that the jury be instructed not to draw an adverse inference from his refusal to take the witness stand, a trial court's failure to give the desired charge, "when requested to do so in a timely fashion, *can never amount to harmless error*." *Id.* at 981 (emphasis in original); *see id.* at 982 ("Because the right of a criminal defendant to decline to take the stand without adverse comment or inference is a fundamental one under

Article I, Section 9 [of the Pennsylvania Constitution], the failure of the trial court to give the 'no-adverse-inference' instruction when so requested is far from the type of '*de minimis*' infraction which might form the basis for a 'harmless error' finding.") (citing *Commonwealth v. Story*, 383 A.2d 155, 164-65 (Pa. 1978)).

Taylor similarly relies upon *Commonwealth v. Edwards*, 637 A.2d 259 (Pa. 1993), where this Court declared that "we have no hesitancy in announcing for the future that it will be *per se* reversible error if a judge instructs the jury concerning a defendant's right to testify when the defendant has requested that no such instruction be given." *Id.* at 262. He posits that the circumstances presented here call for "[t]he same expedience and clarity . . . with regard to violations of the Fifth Amendment during certification hearings." Reply Brief at 9. For these reasons, Taylor concludes that a harmless error analysis is not available under these circumstances.[5]

---

[5] Assuming, *arguendo*, that the harmless error standard does apply, Taylor argues that the Commonwealth's treatment of that issue was inconsistent with the "overwhelming evidence of guilt" test as set forth by this Court in *Story*. *See Story*, 383 A.2d at 166 (stating "that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict"). He contends that the Commonwealth overlooked the *Story* Court's clarification that, "in applying the overwhelming evidence test to determine if an error is harmless, a court may rely only on *uncontradicted* evidence" of guilt. *Id.* at 168 (emphasis added). Taylor notes that the factual determination here was his amenability to treatment, not his guilt, and that the defense presented extensive expert testimony to that effect. Reply Brief for Taylor at 12-13. Because "none of the Commonwealth's evidence regarding amenability was uncontradicted," Taylor reckons that the juvenile court's legal error cannot be deemed harmless by the plain terms of that standard. *Id.* at 13.

**III.**

Faced with a question of constitutional dimensions, the parameters of our review are well-established. The standard of review is *de novo*, and our scope is plenary. *Commonwealth v. Davis*, 220 A.3d 534, 540 (Pa. 2019).

**A.**

The Fifth Amendment to the United States Constitution, applicable to the States pursuant to the Fourteenth Amendment, commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court invariably has referred to the constitutional privilege to be free from compulsory self-incrimination as the "essential mainstay" of our accusatorial system of criminal justice. *See Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (holding that the Fifth Amendment privilege is protected against abridgment by the States via the Due Process Clause of the Fourteenth Amendment). While its genesis can be traced to the ancient "maxim of the common law"—*nemo tenetur seipsum accusare*—"that no man is bound to [in]criminate himself," *United States v. Burr*, 25 F.Cas. 38, 40 (C.C. Va. 1807) (Marshall, C.J.), the privilege's evolution in England and the American colonies resulted from the "painful opposition to a course of ecclesiastical inquisitions and Star Chamber proceedings occurring several centuries ago." *Michigan v. Tucker*, 417 U.S. 433, 440 (1974).

> The maxim . . . had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused person[s] . . . . So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the states, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment.

*Brown v. Walker*, 161 U.S. 591, 596-97 (1896); *see generally Miranda v. Arizona*, 384 U.S. 436, 458-66 (1966) (tracing the origins and evolution of the privilege).

The centrality of the privilege in American jurisprudence is beyond cavil. "The Fifth Amendment stands between the citizen and his government." *Ullmann v. United States*, 350 U.S. 422, 454 (1956) (Douglas, J., dissenting); *see id.* at 445 ("The guarantee against self-incrimination . . . is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well."); *cf. Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (noting that the "Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment"). When scrupulously observed, the privilege ensures that a "court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws." *Burr*, 25 F.Cas. at 40; *see Galbreath's Lessee v. Eichelbergher*, 3 Yeates 515, 516 (Pa. 1803). Because "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon," *Boyd v. United States*, 116 U.S. 616, 635 (1886), the Fifth Amendment is to be "broad[ly] constru[ed] in favor of the right which it was intended to secure." *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892); *see Boyd*, 116 U.S. at 635 ("constitutional provisions for the security of person and property should be liberally construed"); *Quinn v. United States*, 349 U.S. 155, 162 (1955) (same).

To those ends, the High Court has explained that "[t]here are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). In *Griffin v. California*, 380 U.S. 609 (1965), the

seminal decision in the so-called "penalty cases," the Court reflected upon the practice of drawing an adverse inference from a defendant's silence, which it deemed "a remnant of the 'inquisitorial system of criminal justice.'" *Id.* at 614 (quoting *Murphy*, 378 U.S. at 55). Reasoning that "comment on the refusal to testify . . . is a penalty imposed by courts for exercising a constitutional privilege," which "cuts down on the privilege by making its assertion costly," *id.*, the Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615; *see Malloy*, 378 U.S. at 8 (an individual is "to suffer no penalty . . . for such silence"); *United States ex rel. Vajtauer v. Comm'r of Immigration at Port of New York*, 273 U.S. 103, 112 (1927) ("no inference may be drawn from silence where there is no duty to speak"). The *Griffin* rule thus

> reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest entire load"[;] our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"[;] our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Tehan v. United States ex rel. Shott*, 382 U.S. 406, 414 n.12 (1966) (internal citations omitted).

Moreover, although the privilege is commonly understood in the context of criminal allegations, its availability "does not turn upon the type of proceeding in which its

protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Gault*, 387 U.S. at 49; *see Miranda*, 384 U.S. at 467 ("[T]here can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."). "The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory." *Gault*, 387 U.S. at 49; *see, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) (applying the Fifth Amendment to psychiatric examinations conducted pursuant to the penalty phase of a capital murder trial).

Because "[t]he value of constitutional privileges is largely destroyed if persons can be penalized for relying on them," *Grunewald v. United States*, 353 U.S. 391, 425 (1957) (Black, J., concurring), the Supreme Court roundly has "condemn[ed] the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment." *Slochower v. Bd. of Higher Ed. of City of New York*, 350 U.S. 551, 557 (1956); *id.* ("The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury."). The Court thus has seen fit to extend the *Griffin* rule to shield one's invocation of the privilege from retribution in various non-criminal contexts. *See, e.g.*, *Spevack v. Klein*, 385 U.S. 511, 514-16 (1967) (disbarment proceedings); *Gardner*, 392 U.S. at 278-79 (police departments); *Turley*, 414 U.S. at 84-85 (public contracting); *Cunningham*, 431 U.S. at 807-08 (political office); *cf. Slochower*, 350 U.S. at 557-59 (employment in state colleges); *contra Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976) (declining to extend the *Griffin* rule to prison disciplinary matters).

Self-incriminating statements only may be compelled, the Court has clarified, where the potential exposure to criminal punishment no longer exists. Such is the case with grants of immunity. In those discrete instances, "[t]he constitutional inquiry . . . is whether the immunity granted . . . is coextensive with the scope of the privilege." *Kastigar*, 406 U.S. at 449; *see Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute" the accused.). Whereas the Fifth Amendment would prohibit a State from compelling self-incriminating answers that subsequently might be used in criminal proceedings, "the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use." *Turley*, 414 U.S. at 84; *see Counselman*, 142 U.S. at 585 ("[N]o statute which leaves the party or witness subject to prosecution after he answers the [in]criminating question put to him can have the effect of supplanting the privilege conferred by the constitution of the United States."). For that reason, the Court has held that grants of transactional or use-and-derivative-use immunity are "sufficient to compel testimony over a claim of the privilege." *Kastigar*, 406 U.S. at 453.

The preceding authority demonstrates that the Fifth Amendment prohibits "exact[ing] a price" from an individual's silence regardless of the forum in which it is invoked, so long as the threat of future criminal punishment lingers. *See Brooks v. Tennessee*, 406 U.S. 605, 610 (1972) (striking down statute that required defendants who wished to testify to do so before any other defense testimony could be heard). And it is now hornbook law that the Fifth Amendment applies to juvenile proceedings. *See Gault*, 387 U.S. at 55; *In re Whittington*, 391 U.S. 341, 344 (1968) (*per curiam*) ("[V]arious of the

federal constitutional guarantees accompanying ordinary criminal proceedings were applicable to state juvenile court proceedings where possible commitment to a state institution was involved."); *cf. Kent*, 383 U.S. at 551, 556. Pertinently, the Supreme Court has indicated that "[t]he possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile," and thus must comport with constitutional guarantees. *Breed v. Jones*, 421 U.S. 519, 535 (1975) (holding that a prosecution following an adjudicatory proceeding in juvenile court violates the Double Jeopardy Clause of the Fifth Amendment).

When evaluating a petition to transfer a minor to adult court in Pennsylvania, a juvenile court must find "that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution" before granting the Commonwealth's request. 42 Pa.C.S. § 6355(a)(4)(iii). "In determining whether the public interest can be served," the court must consider numerous circumstances. *Id.* The crux of this case centers upon one such circumstance, namely, "whether the child is amenable to treatment, supervision or rehabilitation as a juvenile." *Id.* § 6355(a)(4)(iii)(G). In assessing a minor's amenability to treatment, the juvenile court must weigh the following factors:

> (I) age; (II) mental capacity; (III) maturity; (IV) the degree of criminal sophistication exhibited by the child; (V) previous records, if any; (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child; (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction; (VIII) probation or institutional reports, if any; [and] (IX) any other relevant factors[.]

*Id.* § 6355(a)(4)(iii)(G)(I)-(IX).

Notwithstanding the court's duty to consider the minor's capacity for rehabilitation within the time remaining before jurisdiction expires, the Commonwealth cites no authority, nor have we unearthed any, that remotely suggests that the failure to admit to the commission of a delinquent act—let alone one punishable as a felony if committed by an adult—may be considered by the juvenile court in rendering its decision. To the contrary, we find the Superior Court's opinion in *Brown*, upon which the panel below relied, to be exceedingly persuasive. There the Commonwealth charged eleven-year-old Brown with homicide and homicide of an unborn child after he allegedly shot his father's pregnant fiancé once in the head, killing her. *Brown*, 26 A.3d at 489. Brown subsequently sought to decertify the criminal proceedings and have the matter transferred to juvenile court. *Id.* Relying upon the Commonwealth's psychiatric expert, who evaluated Brown and opined that he could not be rehabilitated unless he took responsibility for his actions— which Brown had not done—the trial court denied his petition, concluding that Brown was not amenable to treatment in the juvenile system. *Id.* at 489-90. The Superior Court reversed, agreeing with Brown's assertion "that the trial court violated his rights against self-incrimination because it effectively required him to admit guilt or accept responsibility to prove that he was amenable to treatment and capable of rehabilitation." *Id.* at 493.

As a threshold matter, the Superior Court began by surveying the prevailing authority to evaluate whether the Fifth Amendment applied to decertification proceedings. The panel drew heavily from a decision of the Supreme Court of Nevada, *In re William M.*, 196 P.3d 456 (Nev. 2008) (*per curiam*), which addressed a facial challenge to the state's juvenile transfer statute. Nevada's certification statute "create[d] a rebuttable presumption that juveniles who are over 13 years of age and charged with certain

enumerated offenses fell outside of the jurisdiction of the juvenile court and must therefore be transferred to the district court for criminal proceedings." *Id.* at 457. "[T]o rebut the presumption of certification," the juvenile court needed to "find by clear and convincing evidence that the juvenile's criminal actions were substantially influenced by substance abuse or emotional or behavioral problems that may be appropriately treated within the jurisdiction of the juvenile court." *Id.* The juvenile appellants argued that the statute required them "to admit to the charged, but unproven, criminal actions" in violation of their constitutionally-protected privilege against self-incrimination. *Id.* The Supreme Court of Nevada agreed. Relying upon *Gault*, the Court concluded that the privilege was available to juveniles in certification proceedings and held that the statute's mandate that a juvenile "admit to the charged criminal conduct in order to overcome the presumption of adult certification . . . violate[d] the juvenile's Fifth Amendment right against self-incrimination." *Id.* at 457.

Relating the *William M.* Court's reasoning to the facts in *Brown*, the Superior Court determined that the trial court "applied 42 Pa.C.S. § 6355(a)(4)(iii)(G) in a manner that required [Brown] to admit his guilt or accept responsibility to demonstrate that he was amenable to treatment and capable of rehabilitation." *Brown*, 26 A.3d at 498. Despite Brown's "assert[ions] of innocence and refus[al] to discuss the details of the crimes he allegedly committed" while undergoing psychological evaluation, the trial court relied upon the testimony of the Commonwealth's expert that Brown first would need to take "responsibility for his actions" in finding that Brown was not amenable to treatment within the juvenile system. *Id.* In so doing, the trial court improperly applied Section 6355(a)(4)(iii)(G) of the Juvenile Act "to effectively require [Brown] to admit and discuss

his involvement in the actions constituting the criminal offenses," thereby violating his privilege against self-incrimination. *Id.*

The Superior Court then considered the applicability of a 2008 amendment to Section 6338 of the Juvenile Act, which added subsection (c)(1), providing for a limited grant of immunity for incriminating statements "obtained from a child in the course of a screening or assessment that is undertaken in conjunction with any proceeding under" the Act. 42 Pa.C.S. § 6338(c)(1). For purposes of the appeal, the Superior Court assumed, without expressly deciding, that the provision would shield any of the statements made by Brown to the Commonwealth's psychiatric expert. *Brown*, 26 A.3d at 499. Recognizing that an individual's Fifth Amendment privilege could be displaced, and the individual compelled to testify, pursuant to a proper grant of immunity, the panel analyzed whether the immunity granted under Section 6338(c)(1) sufficed to nullify any threat of adverse consequences flowing from a compelled, inculpatory statement.

The court began by identifying three types of immunity:

> "Use" immunity provides immunity only for the testimony actually given pursuant to the order compelling said testimony. "Use and derivative use" immunity enlarges the scope of the grant to cover any information or leads that were derived from the actual testimony given under compulsion. . . . "Transactional" immunity is the most expansive, as it in essence provides a complete amnesty to the witness for any transactions which are revealed in the course of the compelled testimony.

*Id.* at 499-500 (quoting *Swinehart*, 664 A.2d at 960 n.5). Because Section 6338(c)(1) provides only basic "use" immunity, which does not protect a witness from any evidence obtained as a result of his admissions, the court reasoned that any statutory immunity was "not co-extensive with the scope of the Fifth Amendment privilege," and necessarily was "insufficient to override [Brown's] Fifth Amendment rights and compel [him] to testify

against himself." *Id.* at 500. Consequently, "[i]n the absence of the requisite grant of at least use/derivative use immunity," the trial court's requirement that Brown "admit guilt or accept responsibility for his actions" on pain of transfer to adult court "subject[ed him] to a 'penalty' sufficient to compel or coerce his testimony" in violation of his Fifth Amendment privilege. *Id.* at 501-502.

In the panel's view, the trial court's interpretation of the transfer statute "encourages a juvenile to tender an admission of guilt" from which the Commonwealth could derive evidence for use in a criminal trial, impermissibly "chilling" the exercise of a fundamental right protected by the Constitution. *Id.* at 505.

> Although the Commonwealth has a legitimate interest in determining whether a defendant is amenable to treatment in the juvenile system, it was not necessary, as a matter of statutory construction, for [Brown] to make an incriminating statement to prove that he was capable of rehabilitation. By its plain language, 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(VII) do not mandate that [Brown] admit guilt, accept responsibility or discuss the details of the facts underlying the charged crimes.

*Id.* at 506-07. "The trial court, therefore, improperly applied 42 [Pa.C.S.] § 6355(a)(4)(iii)(G) in a way that conditioned transfer to juvenile court upon [Brown's] waiver of his Fifth Amendment rights against self-incrimination." *Id.* at 507. Accordingly, the Superior Court concluded that the trial court's misapplication of the transfer statute constituted legal error, which "tainted the entire decertification proceedings" and thus necessitated a remand for a new hearing on Brown's petition. *Id.* at 510.

Instantly, the Commonwealth has declined to contest this thorough analysis, opting instead to relegate its defense of the transfer proceedings below to the bare assertion that Taylor somehow "opened the door" to the juvenile court's consideration of his silence by deigning to contest the petition filed against him. That position, were it to prevail, would

leave juveniles like Taylor with an impossible dilemma: either acquiesce to the transfer to adult court, or challenge it and effectively waive the Fifth Amendment's privilege against self-incrimination by inviting the prosecution and the court to draw an adverse inference from the juvenile's silence. We reject the Commonwealth's "heads I win, tails you lose" proposition out of hand. *Cf. Garrity*, 385 U.S. at 498 ("Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other.").

We also find the Commonwealth's reliance upon *Robinson* to be misplaced. In *Robinson*, the Supreme Court denied a Fifth Amendment challenge to the prosecutor's fleeting comment in summation that the defendant "could have taken the stand and explained [his side of the story] to you." *Robinson*, 485 U.S. at 26. Central to the Court's decision, however, was the portion of defense counsel's closing argument that implied that the government failed to afford Robinson an opportunity to offer an explanation of the relevant events. By suggesting that the prosecution had denied Robinson the chance to explain his side of the story, the defense "opened the door" to the prosecution's oblique "adver[sion] to [his] silence," which the Court characterized as a fair response to Robinson's charge. *Id.* at 34. The *Robinson* Court thus clarified that challenges to a prosecutor's commentary on a defendant's silence must be viewed in the full context in which they arise. *See also Lockett v. Ohio*, 438 U.S. 586, 595 (1978) (holding that "prosecutor's repeated references in his closing remarks to the State's evidence as 'unrefuted' and 'uncontradicted'" did not constitute improper commentary upon Lockett's silence where her "own counsel had clearly focused the jury's attention" there).

Conversely, here we observe that it was the Commonwealth that arguably invited a Fifth Amendment violation by commenting adversely upon Taylor's declination of

culpability in the very proceedings that it initiated in order to prosecute him as an adult. Specifically, the Commonwealth twice noted that Taylor was "in denial" about his alleged offenses. N.T., 4/25/2014, at 44, 109. The first time Taylor's supposed "denial" was invoked, defense counsel's objection was quickly—and correctly—sustained by the juvenile court. *Id.* at 44. Nevertheless, the Commonwealth persisted, reiterating the point in argument. *Id.* at 109. The Commonwealth similarly alluded to Taylor's silence by suggesting to the juvenile court that "admitting guilt" was central to the question of Taylor's amenability to "sex offender treatment" within the juvenile system. *Id.* at 58. It did so again during argument, proclaiming that "the first step towards treatment is admission." *Id.* at 109. But to be clear, the record reflects that at no point did Taylor or his counsel invite commentary upon his assertion of innocence by word or by action. Ergo, the circumstances here are more akin to the situation "[w]here the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence," *Robinson*, 485 U.S. at 32, which *Griffin* plainly forbids.

Of course, we grant that certification proceedings readily are distinguishable from the criminal trials at issue in *Griffin* and its progeny. But whether self-incrimination is compelled in violation of the Fifth Amendment does not turn on the presence of a jury. *See Gault*, 387 U.S. at 49; *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924). Indeed, the Supreme Court has had occasion to find that the conduct of a trial judge alone sufficed to prejudice a defendant in contravention of the Fifth Amendment. In *Mitchell v. United States*, 526 U.S. 314 (1999), the Court considered whether "*a trial court* may draw an adverse inference from the defendant's silence" in making factual findings ahead of sentencing. *Id.* at 317 (emphasis added). In that case, "Mitchell and 22 other defendants

were indicted for offenses arising from a conspiracy to distribute cocaine in Allentown, Pennsylvania, from 1989 to 1994." *Id.* Mitchell entered an open guilty plea to all counts, reserving her "right to contest the drug quantity attributable to her under the conspiracy count," which the District Court advised "would be determined at her sentencing hearing." *Id.* Before accepting the plea, the court explained that, by pleading guilty, Mitchell "would waive various rights, including 'the right at trial to remain silent under the Fifth Amendment.'" *Id.* at 318 (record citation omitted). Mitchell assented.

At sentencing, Mitchell contested the quantity of cocaine attributable to her for purposes of calculating her sentence. "[T]he District Court ruled that, as a consequence of her guilty plea, [Mitchell] had no right to remain silent with respect to the details of her crime." *Id.* at 319. The court also noted that "'one of the things' persuading [it] to rely on the testimony of" Mitchell's codefendants, who identified her as having "been a drug courier on a regular basis," was that Mitchell did "not testify[] to the contrary." *Id.* ("The District Judge told [Mitchell]: 'I held it against you that you didn't come forward today and tell me that you really only did this a couple of times. . . . I'm taking the position that you should come forward and explain your side of this issue.'"). The court sentenced Mitchell to the statutory maximum term of ten years' imprisonment, and the U.S. Court of Appeals for the Third Circuit affirmed. *Id.*

The Supreme Court reversed. Likening Mitchell's plea to an offer to stipulate, the Court rejected the Government's assertion that the "guilty plea was a waiver of the privilege against compelled self-incrimination with respect to all the crimes comprehended in the plea." *Id.* at 321; *see id.* at 325 ("We reject the position that either [Mitchell's] guilty plea or her statements at the plea colloquy functioned as a waiver of her right to remain

silent at sentencing."). The Court cautioned that "[t]reating a guilty plea as a waiver of the privilege at sentencing would be a grave encroachment on the rights of defendants," *id.* at 324, reasoning that:

> [w]ere we to accept the Government's position, prosecutors could indict without specifying the quantity of drugs involved, obtain a guilty plea, and then put the defendant on the stand at sentencing to fill in the drug quantity. The result would be to enlist the defendant as an instrument in his or her own condemnation, undermining the long tradition and vital principle that criminal proceedings rely on accusations proved by the Government, not on inquisitions conducted to enhance its own prosecutorial power. *Rogers v. Richmond*, 365 U.S. 534, 541 (1961) ("[O]urs is an accusatorial and not an inquisitorial system[.]").

*Mitchell*, 526 U.S. at 325 (parallel citations omitted). Hence, the Court reiterated its denunciation of the premise that, "[w]here a sentence has yet to be imposed . . . 'incrimination is complete once guilt has been adjudicated.'" *Id.* (quoting *Estelle*, 451 U.S. at 462).

Acknowledging the general rule that, "where there can be no further incrimination, there is no basis for the assertion of the privilege," the Court "conclude[d] that [the] principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final." *Mitchell*, 526 U.S. at 326; *see id.* ("If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared."). "Where the sentence has not yet been imposed," however, "a defendant may have a legitimate fear of adverse consequences from further testimony." *Id.* Because Mitchell's punishment had not yet been levied, the Court ultimately observed that, "[b]y holding [Mitchell's] silence against her in determining the facts of the offense at the sentencing hearing," the trial court "imposed an impermissible burden on the exercise of the constitutional right against

compelled self-incrimination." *Id.* at 330. *Accord United States v. Hale*, 422 U.S. 171, 181 (1975) (holding that "it was prejudicial error for the trial court to permit cross-examination of [Hale] concerning his silence during police interrogation"); *Grunewald*, 353 U.S. at 424 (holding that "it was prejudicial error for the trial judge to permit cross-examination of [Grunewald] on his plea of the Fifth Amendment privilege before the grand jury").

In view of the foregoing authority, we adopt the Superior Court's well-reasoned opinion in *Brown* to the extent that it holds that the protections of the Fifth Amendment are applicable to juvenile transfer proceedings. We recognize that the Juvenile Act vests with the juvenile court a substantial degree of discretion within which to adjudge whether jurisdiction over a minor should be retained or should be transferred to an adult court for criminal prosecution. "But this latitude is not complete." *Kent*, 383 U.S. at 553. Like the juvenile statute at issue in *Kent*, our Juvenile Act "assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness." *Id*; *see Commonwealth v. Pyle*, 342 A.2d 101, 105 (Pa. 1975) (adopting *Kent's* formulation of the rights of juveniles in transfer proceedings and holding that "in order to try in a criminal court any person who might qualify as a juvenile, the waiver into such criminal court must be in a manner conforming to due process of law"). Although a juvenile court has "considerable latitude" in weighing relevant facts for purposes of evaluating a transfer petition, *Kent*, 383 U.S. at 552-53, we now hold that the Juvenile Act does not countenance the drawing of an adverse inference from a juvenile's refusal to admit to the offenses with which the juvenile is charged. When faced with a critical decision such as whether to certify a juvenile for transfer to an adult court for prosecution,

a court may not condition its ruling upon the minor's assertions of innocence or invocation of the Fifth Amendment. To do so would place too high a cost on the juvenile's constitutional privilege against compulsory self-incrimination, guaranteed by the Fifth Amendment. *See Griffin*, 380 U.S. at 614.

We also concur in the *Brown* Court's conclusion that Section 6338 of the Juvenile Act does not provide a guarantee of immunity sufficient to displace the Fifth Amendment privilege in juvenile transfer proceedings. The immunity statute covers only an "extrajudicial statement" that could be used against the juvenile, 42 Pa.C.S. § 6338(b), and "statements, admissions or confessions made by or incriminating information obtained from a child in the course of a screening or assessment that is undertaken in conjunction with proceedings under" Chapter 63 of the Pennsylvania Code. *Id.* § 6338(c)(1). It extends only so far as to bar the admission of evidence of a self-incriminating character "against the child on the issue of whether the child committed a delinquent act . . . or on the issue of guilt in any criminal proceeding." *Id.* By its plain terms, the statute applies only to incriminating statements themselves, and does not encompass evidence derived from such statements. Therefore, the immunity contemplated in Section 6338 cannot be considered coterminous with the Fifth Amendment privilege so as to permit a court to compel a juvenile in Taylor's position to incriminate himself in order to demonstrate his amenability to treatment within the juvenile system.[6]

---

[6] Relatedly, the record fails to elucidate whether Taylor was advised of his right to remain silent prior to undergoing psychiatric assessment by the Commonwealth's expert. *Compare Estelle*, 451 U.S. at 468 (holding that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may

In sum, Taylor's decision to maintain his innocence was committed to him and him alone by the Constitution, and he did so in clear terms while under court-mandated psychiatric examination. Plainly, he "need not have the skill of a lawyer to invoke the protection of the Self-Incrimination Clause." *Quinn*, 349 U.S. at 162; *see id.* ("It is agreed by all that a claim of the privilege does not require any special combination of words."); *cf. Tucker*, 417 U.S. at 439 ("At this point in our history virtually every schoolboy is familiar with the concept, if not the language," of the Fifth Amendment's Self-Incrimination Clause.). But "by 'solemnizing the silence of the accused into evidence against him,'" *Portuondo v. Agard*, 529 U.S. 61, 65 (2000) (quoting *Griffin*, 380 U.S. at 614) (brackets omitted), the juvenile court denied to Taylor—who, we must emphasize, remained cloaked in "the presumption of innocence which the law gives to everyone," *Wilson v. United States*, 149 U.S. 60, 66 (1893)—the privilege entrusted to him by the Bill of Rights.

Simply put, a minor's refusal to confess to an act for which he or she might be criminally prosecuted as an adult may not be considered when deciding whether to certify a case for transfer between juvenile and adult court. This remains true irrespective of the necessary considerations of amenability to treatment contemplated by the Juvenile Act or of the possibility of immunity contained therein. As there is no way to guarantee that certification would be denied, or decertification granted, upon an admission of guilt, a minor cannot be expected to take so broad a leap of faith.

## B.

Having concluded that Taylor's Fifth Amendment privilege was infringed upon in the transfer proceedings below, we need not dwell on the subordinate issue at length. It

not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding").

is a paradigmatic abuse of discretion for a court to base its judgment upon an erroneous view of the law. *See Mielcuszny v. Rosol*, 176 A. 236, 237 (Pa. 1934) ("An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied . . . discretion is abused."); *Commonwealth v. Braithwaite*, 385 A.2d 423, 426 (Pa. 1978) (same); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").[7]

Whether to certify a juvenile matter for transfer is a decision committed to the sound discretion of the juvenile court pursuant to a carefully prescribed, multi-factored statutory analysis. Although we concur in the Superior Court's pronouncement that the juvenile court committed constitutional error by weighing Taylor's silence against him, we find that the panel's rationalization that the lower court did not abuse its discretion was itself erroneous.

The constitutional privilege against compelled self-incrimination "is a fundamental one," and any "practice which exacts a penalty for the exercise of the right is without justification and unconstitutional." *Bethea*, 379 A.2d at 104. This concern is no less significant when the penalty contemplated is the transfer of a minor to adult court for criminal prosecution, where the pain of imprisonment looms overhead like the Sword of Damocles. Because the juvenile court exacted a price for Taylor's exercise of his rights under the Fifth Amendment, its decision reflects a misapplication of the law, and thus an abuse of discretion.

---

[7]    *Accord In re Doe*, 33 A.3d 615, 628 n.19 (Pa. 2011) (finding an abuse of discretion where the trial court "reli[ed] upon the [juvenile's] failure to seek parental consent as a ground upon which to deny the application for judicial authorization" to exercise her constitutionally protected right to obtain an abortion).

Traditionally, the prosecution bears the burden of demonstrating that any prejudice resulting from a *Griffin* violation did not redound to the defendant's detriment. *See Chapman v. California*, 386 U.S. 18, 25-26 (1967) (applying harmless error review to *Griffin* errors); *Commonwealth v. Henderson*, 317 A.2d 288, 291 (Pa. 1974) (same); *cf. Anderson v. Nelson*, 390 U.S. 523, 523-24 (1968) (*per curiam*) (holding that "comment on a defendant's failure to testify cannot be labeled harmless error in a case where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal").

Here, however, we are presented with a Fifth Amendment violation which was squarely committed by a juvenile court, sitting as the finder of fact, charged with the solemn duty to adjudicate whether a minor should be tried as an adult. The *Mitchell* Court did not affix the appropriate remedy in this rare context. And we are without advocacy on the significant question of whether the instant violation ranks as error of the kind the Supreme Court has deemed "structural," and thus beyond remediation under a harmless error review.[8] Accordingly, we reverse the judgment of the Superior Court and remand for a determination, in the first instance, and with developed advocacy of the parties, of whether the harmless error doctrine is applicable to the juvenile court's constitutionally deficient misapplication of the Juvenile Act's transfer provisions and, if it is not or if the error is not harmless, for consideration of the available relief under these circumstances.[9]

It is so ordered.

---

[8]     *Cf. McCoy v. Louisiana*, ___ U.S. ___, 138 S.Ct. 1500, 1512 (2018) (holding that a trial court's allowance of defense counsel's admission of guilt on behalf of his client, despite the defendant's insistent objections, was incompatible with the Sixth Amendment and thus constituted structural error necessitating the award of a new trial).

[9]     In light of our resolution of this case on constitutional grounds, we decline the Commonwealth's invitation to assess the weight of the certification hearing evidence based upon the parties' dueling expert testimony at this juncture.

Chief Justice Saylor and Justices Todd and Mundy join the opinion.

Justice Baer files a concurring and dissenting opinion in which Justices Donohue and Dougherty join.